[Sac. No. 5725.   In Bank.   June 24, 1947.]

VICTOR TRUBOWITCH et al., Appellants, v. RIVERBANK CANNING COMPANY (a Corporation), Respondent.

Norman A. Eisner for Appellants.

F. M. Brack for Respondent.

TRAYNOR, J.—Plaintiffs instituted this proceeding in the superior court under section 1282 of the Code of Civil Procedure to enforce an agreement to arbitrate controversies arising under a written contract for the sale of 3,900 cases of No. 10 tomato paste from defendant's 1942 production. The contract was entered into on August 20, 1942, by defendant as seller and Pan American Food Corporation, plaintiffs' assignor as buyer and was on a form adopted by the Canners' League of California and approved by the National-American Wholesale Grocers' Association. It contained the following provisions: ''Any controversy arising out of this contract shall be settled by arbitration in New York, Chicago or San Francisco. In the absence of agreement by the parties arbitration shall be held in the above city nearest to the point where the goods are located. Arbitrations shall be held before and under the rules of the joint arbitration boards appointed or approved by the National-American Wholesale Grocers' Association, the National Food Brokers' Association and the National Canners' Association. The arbitrators shall assess the costs of the arbitration and the decision shall be final and binding upon both parties, who hereby agree to comply therewith. No unimportant variations in the execution of this agreement shall constitute basis for a claim. Each party hereto hereby agrees that a judgment of the United States District Court in and for the District within which the award was made shall be entered upon the award made, but the State Courts shall have sole jurisdiction of enforcing this agreement to arbitrate and any arbitration award in all cases in which the United States District Court shall not have jurisdiction.''

In their petition to enforce the arbitration agreement plaintiffs alleged that Pan American Food Corporation, a New York corporation, was voluntarily dissolved on December 29, 1942; that all of the assets of the dissolved corporation were assigned to plaintiffs as its sole stockholders; that plaintiffs formed a copartnership under the name of Pan American Food Company and carried on the business of the corporation without change in management or personnel. With respect to the claim to be arbitrated plaintiffs' petition asserts: ''That

Riverbank Canning Company failed to make any delivery whatsoever under said contract to either Pan American Food Corporation or Pan American Food Company, and that an actual controversy has arisen and exists as to liability of Riverbank Canning Company to Pan American Food Company for failure of Riverbank Canning Company to make deliveries under said contract.'' Defendant alleges that governmental requirements and other circumstances beyond its control prevented it from delivering the goods. It contends, however, that plaintiffs cannot invoke the arbitration provisions of the contract, on the ground that they are assignees and that the contract was nonassignable under the following provision of the contract: ''This contract is not assignable and goods sold hereunder are not to be shipped or diverted to any destination other than that herein specified, without consent of seller.'' Plaintiffs contend that this provision is not applicable, on the grounds that it does not preclude an assignment of a claim for money damages for nonperformance of the contract; that defendant waived its right to object to the validity of the assignment by dealing with plaintiffs and making a compromise with them, knowing that they were assignees; and that in any event the transfer of the contract rights to them was not an assignment within the meaning of the contract.

The court found ''That on or about December 29, 1942 . . . Pan American Food Corporation was voluntarily dissolved, at which time all of the assets of said corporation were transferred to plaintiffs. That said plaintiffs were the sole stockholders of said corporation; that plaintiffs did thereupon form a co-partnership under the name of Pan American Food Company. . . . That on or about August 20, 1942, defendant entered into a contract in writing for the sale by defendant to said Pan American Food Corporation of 3900 cases of tomato paste. . . . That it is not true that since the dissolution of said Pan American Food Corporation, or at any other time, . . . said plaintiffs have been or ever were the owners of said contract or any rights arising thereunder; That it is true that Riverbank Canning Company never did make any deliveries under said contract; that no actual controversy has arisen between said Riverbank Canning Company and plaintiffs out of or by virtue of said contract. That it is not true that since the dissolution of Pan American Food Corporation, Riverbank Canning Company has repeatedly or at all recog-

nized or dealt with plaintiffs as the owner of said contract. . . . That defendant never at any time consented to any assignment of said contract.'' The court concluded that plaintiffs had no right to compel defendant to arbitrate the controversy and dismissed plaintiffs' petition. Plaintiffs appeal.

The trial court based its interpretation of the nonassignable clause solely on its written terms and made its other findings solely upon the correspondence between Pan American Food Corporation and defendant and between plaintiffs and defendant and their respective counsel. No other evidence was before the court, and the case was submitted on briefs. ■ It is settled in this state than an appellate court is not bound by a trial court's construction of a contract or other written instrument based solely upon the terms of the instrument. (*Estate of Platt,* 21 Cal.2d 343, 352 [131 P.2d 825] ; *Moore* v. *Wood,* 26 Cal.2d 621, 630 [160 P.2d 772] ; *Western Coal & Mining Co.* v. *Jones,* 27 Cal.2d 819, 827 [167 P.2d 719, 164 A.L.R. 685].) ■ It is contended that the arbitration clause requires arbitration not only of the merits but also of the question whether the rights asserted by plaintiffs were validly assigned to them by specifying ''any controversy arising out of this contract.'' In the proceeding in the superior court plaintiffs did not contend, however, that the question whether the assignment was valid should be determined by the arbitration board; they submitted that issue to the court without reservation. A party waives his right to arbitrate an issue by failing to plead such right. (*Landreth* v. *South Coast Rock Co.,* 136 Cal.App. 457, 462 [29 P.2d 225] ; see 3 Cal.Jur. 54; 117 A.L.R. 301; 161 A.L.R. 1426.) Thus it is unnecessary to determine whether plaintiffs had the right to withhold the issue of the validity of the assignment from the court; if they had such a right they waived it by seeking without reservation a judicial determination of that issue.

Plaintiffs contend that what they acquired by the assignment was only a claim for money damages for nonperformance and that such claim is not within the scope of the clause prohibiting assignment of the contract. ■ It is established that a provision in a contract or a rule of law against assignment does not preclude the assignment of money due or to become due under the contract (*Butler* v. *San Francisco Gas etc. Co.,* 168 Cal. 32, 41 [141 P. 818] ; *Taylor* v. *Black Diamond Coal Co.,* 86 Cal. 589, 590 [25 P. 51] ; *Dixon-Reo Co.* v. *Horton Motor Co.,* 49 N.D. 304 [191 N.W. 780] ; see 76 A.L.R.

1307; 2 Williston, Contracts, rev. ed., § 422), or of money damages for the breach of the contract. (*Rosecrans* v. *William S. Lozier, Inc.*, 142 F.2d 118, 124; *Gulf States Creosoting Co.* v. *Loving*, 120 F.2d 195, 199; *Ocean Accident & Guarantee Co.* v. *Southwestern Bell Telephone Co.*, 100 F.2d 441 [122 A.L.R. 133]; *Florance* v. *Kresge*, 93 F.2d 784; *Industrial Trust Co.* v. *Stidham*, 42 Del. 339, 344 [33 A.2d 159]; *Liberty* v. *Pooler*, 134 Me. 115, 117 [182 A. 216]; *Searcy* v. *Casualty Co. of America*, 149 App.Div. 316 [133 N.Y.S. 685, 686]; see *Shively* v. *Semi-Tropic L. & W. Co.*, 99 Cal. 259, 261 [33 P. 848]; *Ginsburg* v. *Bull Dog Auto Fire Ins. Association*, 328 Ill. 571 [160 N.E. 145, 56 A.L.R. 1387]; 2 Williston, Contracts, rev. ed., § 412, p. 1180; 4 Am.Jur. 237, 239, 240; 6 C.J.S. 1080.) Defendant contends, however, that at the end of December, 1942, when the corporation was dissolved and its assets transferred to plaintiffs, the asserted breach had not occurred and defendant was still entitled to perform the contract because of the provision for its termination on February 28, 1943. Plaintiffs rely on provisions of the contract that in their opinion compel the interpretation that defendant had to follow shipping instructions of the purchaser, given in September, 1942, and reiterated in November, 1942.

It is not necessary to determine which construction of the contract is correct, for even if it be assumed that defendant could determine the date of delivery, it would not follow that the contract was not breached at the end of December when the assignment occurred. The correspondence between Pan American Food Corporation and defendant leaves no doubt that defendant had decided that whatever delivery it made would be before the end of December, 1942. On December 1, 1942, it refused to deliver on the ground that requisitions by the government made it impossible to deliver any goods of the kind sold under the contract. On November 14, 1942, defendant answered the urgent requests of Pan American Food Corporation for delivery of goods under the contract by the following letter: "Our deliveries on tomato paste sales will not exceed 35%. As yet our pack has not reached that much, but we bought some goods from other packers, and so we are able to make 35% delivery on tomato paste packed in tin. . . . On the glass pack, we will not make any delivery, because this year we had a lot of trouble. We are ready to forward shipment of one-third of your purchase; we have packed the goods for you and it is ready, but unfortunately

when we analyzed it we found that some of the paste did not run as high as 25%. Perhaps a batch or two will run 18%, some 22%, some 25%, some 27%, and may be 30%. We just discovered that we have a lot of merchandise packed that way. . . . We are ready to make delivery of 35% of your purchase, if you take it just as it is. You must take a chance on the density—we will not guarantee it. If we know that certain batches are not thick enough for tomato paste we will not label it as tomato paste. We will label it as heavy puree, because we do not want to get into trouble. Anything that is below 25 we cannot call paste. We are here to serve you, and we offer you what we have at the price you bought. If you will let us know within the next 3 or 4 days we shall be pleased to forward a car.'' Pan American Food Corporation was unwilling to accept such delivery, and the matter was discussed at defendant's plant some time between November 14 and December 1, 1942. On the latter date defendant wrote to Pan American Food Corporation: ''It was indeed a pleasure to see you last week here at the plant. That will give not only satisfaction that what we tell you is the truth, but will give you the knowledge that the government took all of our #10 tomatoes, tomato paste and puree. We were ready to make delivery of 35% of your order, but now we definitely cannot do that, because the minute the Quartermaster Depot telephones us not to ship any more #10 tomato paste in any shape or form, our hands are tied, and unfortunately you cannot get delivery. These are conditions beyond our control and we are sorry we cannot serve you as we would like . . . during the packing season, you know we could not ship goods because the WPB gave us instructions as per their order M-237. Then when some relief came on the M-237 we did not have any labor to pack and ship and we still haven't any labor to speak of. Unfortunately when we were almost ready to ship, this new order came in from the Quartermaster and left us without source to serve you.'' This letter terminated the correspondence with respect to the performance of the contract. Defendant's refusal to deliver as expressed in this letter was final, and it made no attempt to deliver the goods in the interval between the date of this letter and February 28, 1943, the date when the contract ended.

■ If a seller, in the absence of a contract provision specifying the date of delivery, is entitled to determine that date, he is bound to deliver the goods within a reasonable time.

(Civ. Code, § 1763(2) ; see cases collected in 1 Uniform Laws Annotated, note III to § 43.) In the present case defendant, which had not complied with shipping instructions given in September and at later dates, itself fixed the time for whatever delivery it would make under the contract. ▮ Since defendant refused to deliver at the time that it had set itself and based its refusal on a ground that prevented it from making any delivery, the buyer's claim for money damages for nonperformance, if defendant was not excused from performance, was in existence at the time of the assignment on December 29, 1942. (Civ. Code, § 1787(1).) ▮ Even if the date for delivery had not arrived, defendant's refusal to deliver entitled the purchaser immediately to bring an action for damages, since the doctrine of "anticipatory breach is recognized in California." (*Caminetti* v. *Pacific Mutual Life Ins. Co.*, 23 Cal.2d 94, 104 [142 P.2d 741] and cases there cited; see 6 Cal.Jur. 457.) The assignment of the contract rights related clearly to the claim for nonperformance of the contract, for when it made the assignment Pan American Food Corporation could not reasonably expect that the goods would be delivered.

Plaintiffs contend that defendant waived its rights under the nonassignable clause by entering into negotiations for a compromise and making a compromise of the claim for damages for nonperformance with plaintiffs, knowing that plaintiffs claimed the rights under the contract as successors to the corporation that entered into the contract with defendant. ▮ It is settled in this state that a party benefited by a clause against assignment in a contract or lease may waive his right thereunder by dealing with an assignee with regard to the contract or lease, with knowledge of the assignment. (*California Packing Corp.* v. *Lopez*, 207 Cal. 600, 603 [279 P. 664, 64 A.L.R. 1412] ; *Maguire* v. *Lees*, 74 Cal.App.2d 697, 705 [169 P.2d 411] ; *German American Sav. Bank* v. *Gollmer*, 155 Cal. 683, 691 [102 P. 932, 24 L.R.A.N.S. 1066] ; *Randol* v. *Tatum*, 98 Cal. 390, 397 [33 P. 433] ; *Randol* v. *Scott*, 110 Cal. 590, 597 [42 P. 976] ; *Chapman* v. *Great Western Gypsum Co.*, 216 Cal. 420, 426 [14 P.2d 758, 85 A.L.R. 917] ; *Taylor* v. *Odell*, 50 Cal.App.2d 115, 121 [122 P.2d 919] ; *Ruppe* v. *Utter*, 76 Cal.App. 19, 24 [243 P. 715] ; *People* v. *Jones*, 87 Cal.App. 482, 488 [262 P. 361] ; *Rutledge* v. *Barger*, 82 Cal. App. 356, 359 [255 P. 537] ; *Spangler* v. *Spangler*, 11 Cal. App. 321, 324 [104 P. 995] ; see 3 Cal.Jur. 240 ; 25 Cal.Jur.

929; 3 Thompson, Real Property, perm. ed., § 1437, and cases there collected.) In the present case defendant acquired knowledge of the assignment by a letter of plaintiffs' counsel dated June 2, 1943, which began with the statement: "I represent the Pan American Food Company, successor to the Pan American Food Corporation, with which said corporation you entered into a contract for the sale of 3900 cases of Tomato Paste under date of August 20, 1942." In this letter plaintiffs' counsel referred to the fact that despite successive demands made upon defendant, no delivery was made under the contract; that under the contract the seller's failure to deliver for any reasons, including requisitions by the government, must be sanctioned by a certificate issued by the Canners' League of California; and that without such a certificate the seller is under an obligation to pay damages for nonperformance. Counsel therefore demanded such a certificate. Defendant did not produce the certificate but expressed its wish to preserve the goodwill of its customer and to compromise the matter by making a new contract for the delivery of tomato paste at 1943 prices. In September, 1943, it was agreed that in settlement of the controversy defendant would deliver one and one-half carloads of tomato paste to plaintiffs; plaintiffs reserved the right to avail themselves of their claim for damages if such delivery was not made. Defendant failed to deliver under the compromise agreement, and when plaintiffs, at the end of October, requested an immediate answer as to why no delivery had been made, defendant sent a telegram on October 27, 1943, addressed to Pan American Food Company: "We have been trying to ship you tomato paste as per friendly settlement but the government is taking every can of paste we can pack and do not want to give us any relief. . . ."

Plaintiffs also contend that construed in the light of the purposes it was designed to serve and the meaning that traders may reasonably be expected to give its terms (Civ. Code, §§ 1643, 1644, 1647, 1648; Code Civ. Proc., §§ 1860, 1865; *In re City and County of San Francisco,* 191 Cal. 172, 177 [215 P. 549]; *Cohn* v. *Cohn,* 20 Cal.2d 65, 69 [123 P.2d 833]; *Stein* v. *Archibald,* 151 Cal. 220, 223 [90 P. 536]; *Andersen* v. *La Rinconada Country Club,* 4 Cal.App.2d 197, 200 [40 P.2d 571]; *Nelson* v. *Dutton,* 63 Cal.App. 717, 722 [220 P. 12]; see Rest., Contracts, § 236; 6 Cal.Jur. 271; 17 C.J.S. 739), the contract did not prohibit an assignment of

344

the contract rights to the sole stockholders of the corporation who continued its business upon its dissolution and the distribution of its assets to its stockholders.

"Where a bilateral contract in terms forbids assignment, it becomes a matter of interpretation as to what is meant. Is it intended that a duty under the contract shall not be delegated, or is it intended that a right shall not be assigned, or are both prohibitions intended?" (2 Williston, Contracts, rev. ed., 1217.) Even if it is assumed that the prohibition against assignments relates to rights rather than duties, it does not necessarily apply to all claims under the contract or to all transfers of the contract rights. It is established that in the absence of language to the contrary in the contract, a provision against assignment does not govern claims for money due or claims for money damages for nonperformance; (see cases cited, *supra*, p. 340) that a covenant against assignment in a lease is not broken by changes in the firm of the lessee incident to the admission of a new partner or the withdrawal of an old partner or by the dissolution of a partnership and transfer of the rights under the lease with all other assets of the partnership to one of the partners (*Safeway Stores, Inc.* v. *Buhlinger,* 85 Cal.App. 717, 719 [259 P. 1013]; *Adelstein* v. *Greenberg,* 77 Cal.App. 548, 553 [247 P. 520]; *Spangler* v. *Spangler,* 11 Cal.App. 321, 323 [104 P. 995]; *Randol* v. *Scott,* 110 Cal. 590, 594 [42 P. 976]; *Roosevelt* v. *Hopkins,* 33 N.Y. 81, 82; *Morris Glick, Inc.* v. *Grubman,* 56 N.Y.S.2d 324, 326; *Paul Pleating & Stitching Co., Inc.* v. *Levine,* 137 Misc. 82 [242 N.Y.S. 729, 733]; *Galligan & Co.* v. *P.S.M. Inc.,* 116 Misc. 754 [191 N.Y.S. 523, 526]; *Miller* v. *Pond,* 214 Mich. 186 [183 N.W. 24, 17 A.L.R. 179]; *Burleson* v. *Blankenship,* 193 Wash. 547 [76 P.2d 614]; *Hunt* v. *Shell Oil Co.,* 116 F.2d 598, 600; *Boyd* v. *Fraternity Hall Association,* 16 Ill.App. 574); that a provision against assignment in a contract or lease does not preclude a transfer of the rights thereunder by operation of law (*California Packing Corp.* v. *Lopez,* 207 Cal. 600, 603 [279 P. 664, 64 A.L.R. 1412]; *Farnum* v. *Hefner,* 79 Cal. 575, 581 [21 P. 955, 12 Am.St.Rep. 174]; *Gazlay* v. *Williams,* 210 U.S. 41, 47 [28 S.Ct. 687, 52 L.Ed. 950]; *Francis* v. *Ferguson,* 246 N.Y. 516 [159 N.E. 416, 55 A.L.R. 982]; see 4 Am.Jur. 284); and that if an assignment results merely from a change in the legal form of ownership of a business, its validity depends upon whether it affects the interests of the parties protected by the nonassign-

ability of the contract. (*Model Baking Co.* v. *Dittman* (Tex. Civ.App.) 266 S.W. 802, 803; *Walker* v. *Mason*, 272 Pa. 315 [116 A. 305]; *Bradford & Carson* v. *Montgomery Furniture Co.*, 115 Tenn. 610, 617 [92 S.W. 1104, 9 L.R.A.N.S. 979]; *Fisher* v. *Berg*, 158 Wash 176, 179 [290 P. 984]; *Gulf States Creosoting* v. *Loving*, 120 F.2d 195, 199; see 6 C.J.S. 1075.)

No interest of the seller would be served by preventing the rights under this contract for the sale of standard goods from passing to a copartnership continuing the business of the corporation formed by its sole stockholders, who were entitled to the assets of the corporation upon its dissolution. (Civ. Code, § 401a; N. Y. Gen. Corp. Law, § 117; *North Hollywood Mortgage Co.* v. *North Amer. Bond & Mortgage Co.*, 137 Cal. App. 180, 186 [30 P.2d 446]; see *Capuccio* v. *Caire*, 189 Cal. 514, 526 [209 P. 367]; 97 A.L.R. 479; 47 A.L.R. 1355.)

█ Since the assets of a dissolved corporation can only be distributed to the shareholders subject to the rights of creditors of the corporation, the assets of the corporation remained subject to an equitable charge for all debts owed by the corporation (see Civ. Code, § 402; *Estate of Scrimger*, 188 Cal. 158, 166 [206 P. 65]; *Stanford Hotel Co.* v. *M. Schwind Co.*, 180 Cal. 348, 354 [181 P.780]; 16 Fletcher, Cyc. Corporations, perm. ed., §§ 8127, 8161; Ballantine, Corporations, rev. ed., 723; see 97 A.L.R. 480), and its shareholders who continued the business as a copartnership became personally liable to the creditors of the corporation on existing contracts. (*National Union Bank of Watertown* v. *Landon*, 45 N.Y. 410; *Steele* v. *Stanley*, 237 Ky. 517 [35 S.W.2d 867]; 16 Fletcher, *ibid.*, § 8132.) █ Nor under modern statutes does the dissolution of the corporation terminate its ability to enforce a contract for the delivery of goods. (Civ. Code, § 399; New York Gen. Corp. Law, § 29; *Stentor El. Mfg. Co.* v. *Klaxon Co.*, 115 F.2d 268; *United States* v. *Safeway Stores*, 140 F. 2d 834, 836, 838; *I. Kalfus Co.* v. *Ad Press*, 184 Misc. 285 [53 N.Y.S.2d 496]; *People ex rel. Balbrook Realty Co.* v. *Mills*, 54 N.Y.S.2d 244, affd. 54 N.Y.S.2d 707; 1 White NewYork Corporations, 960, n. 18.3 to § 29 Gen. Corp. Law; see, also, Marcus, *Suability of Dissolved Corporations*, 58 Harv.L.Rev. 675; Ballantine, Corporations, rev. ed., 727-729; 13 Am.Jur. 1207; 16 Fletcher, *ibid.*, §§ 8170-8172; 19 C.J.S. 1485-1501; 97 A.L.R. 496; 47 A.L.R. 1548.) If the dissolved corporation had brought an action for the delivery of the goods, the real parties in interest would have been its shareholders, and the

purchase price would have been payable by the shareholders out of the assets of the corporation distributed to them or out of their other property. To require an action to be brought under such circumstances by the dissolved corporation rather than by the copartnership formed by its shareholders, which owns all the assets of the corporation and carries on its business, is to require compliance with a shallow formality that serves no substantial interest of the seller. The seller's financial interests were fully protected. The contract called for delivery "F.O.B. Pacific Coast rail shipping point," and provided that the purchase price was to be paid in cash upon delivery of the documents securing control of the merchandise. In addition, the contract also provided that "If during the life of this agreement the financial responsibility of the buyer becomes impaired . . . cash payment in advance with regular discount may be demanded by seller before further shipments are made." Thus performance of the contract involved only the receiving of money by defendant, not to be compared with fiduciary services such as were promised by the dissolved corporation in *New York Bank Note Co.* v. *Hamilton Bank Note Engraving & Printing Co.,* 180 N.Y. 280 [73 N.E. 48], on which defendant relies, or with other services requiring special skill, capacity or taste.

We have considered defendant's contention that notice of appeal was not filed by plaintiffs within the period of 60 days after entry of judgment as required by rule 2(a) of the Rules on Appeal. Plaintiffs' petition was heard by the superior court on September 15, 1944. After oral argument and submission of briefs, the court on October 21, 1944, announced "that said petition be and the same is hereby denied and the Defendant's motion for dismissal is granted." The record does not reveal when this order was entered in the minutes. On October 27th, the court made another order that defendant prepare and submit findings of fact and conclusions of law. On January 5, 1945, the court heard the matter for the purpose of settling the findings and adopted defendant's findings with immaterial changes. The minutes, after stating the order, recite: "Thereupon the Respondent objected to the signing or filing of any Findings of Fact and Conclusions of Law or any Judgment or Decision other than to set aside the Court's previous order directing preparation of Findings and said objection was overruled on the ground that the order of October 21, 1944, was intended solely to indicate

the opinion of the Court and on the further ground that proposed Findings of Fact and Conclusions of Law were submitted by Respondent on November 16th 1944.'' The parties agree that the notice of appeal was filed within the prescribed period, if the time did not start to run from the date when the order of October 21, 1944, was entered in the minutes. ▉ It is settled that where findings are essential there is no rendition of final judgment until findings are signed and filed. (*Supple* v. *Luckenbach,* 12 Cal.2d 319 [84 P.2d 52].) ▉ A proceeding under section 1282 of the Code of Civil Procedure, although in form a special proceeding, is in substance a suit in equity for specific performance of a contract to arbitrate. (See *De Garmo* v. *Goldman,* 19 Cal.2d 755, 759 [123 P.2d 1] ; *California P. & A. Growers' Association* v. *Gatz American Co.,* 60 F.2d 788, 790, 85 A.L.R. 1117 ; *Red Cross Line* v. *Atlantic Fruit Co.,* 264 U.S. 109, 124 [44 S.Ct. 274, 68 L.Ed. 582] ; *Nippon Ki-Ito Kaisha* v. *Ewing-Thomas Corp.,* 313 Pa. 442 [170 A. 286, 93 A.L.R. 1067] ; *Matter of Berkovitz* v. *Arbib & Houlberg,* 230 N.Y. 261, 269 [130 N.E. 288] ; see 3 Am.Jur. 912.) ▉ When the court in a contested case decides whether or not a claimant has a right to specific performance of a contract to arbitrate, such decision requires findings like any other determination of an equity case. (*Holland* v. *Kelly,* 177 Cal. 43, 45 [169 P. 1000] ; see 24 Cal.Jur. 933, 10 Cal.Jur. 10-Yr.Supp. 737.) In any event section 1282 contemplates findings by the court. It provides: ''If no jury trial be demanded said court shall hear and determine such issue. If the finding be that no agreement in writing providing for arbitration was made, or that there is no default in proceeding thereunder, the proceeding shall be dismissed. If the finding be that a written provision for arbitration was made and there is a default in proceeding thereunder, an order shall be made summarily directing the parties to proceed with the arbitration in accordance with the terms thereof.''

The judgment is reversed.

Gibson, C. J., Shenk, J., and Carter, J., concurred.

EDMONDS, J.—As I read the record in this case, the evidence shows that there was no breach of the contract by the seller prior to the assignment, the seller did not waive his right to object to the validity of the assignment, and the as-

signment is one prohibited by the express terms of the contract. Furthermore, the authorities clearly establish that the issue of assignability is not one subject to arbitration but is a question for judicial determination. Under such circumstances there could be no waiver of a right to arbitration.

Although I agree that a general nonassignability provision, such as is found in the contract here in controversy, does not preclude an assignment of a chose in action for breach of contract, the present case does not fall within this rule because there is no proof of a breach of the contract by the seller prior to the assignment. Assuming that, by the terms of the agreement, the seller could determine the date of delivery, according to the correspondence between the parties, the seller did not decide to make any delivery before December 29th, except a limited one which was rejected by the partnership. And although in the letter of December 1, 1942, the seller stated that it could not make delivery as agreed, this statement does not justify the conclusion, as a matter of law, that the canner then determined to breach the contract. The most that may be said is that the letter is susceptible of such an inference. On the other hand, the letter reasonably may be read as a statement by the seller agreeing to make future deliveries as soon as practicable and within a reasonable time. Under such circumstances, the findings of the trial court must be upheld. *Estate of Platt,* 21 Cal.2d 343, 352 [131 P.2d 825], stands only for the rule that if the court has before it for interpretation only the instrument whose terms are in controversy, such as a contract or a will, an appellate court is not bound by the construction of the trial court.

There are other reasons for denying the partnership relief upon the theory that a breach of contract occurred prior to the assignment. It is conceded that the parties submitted the issue as to whether the assignment is valid to the trial court "without reservation." Upon the partners' theory of their rights, necessarily included in that issue is the question as to whether performance by the seller prior to the assignment was excused. Clearly, the contract's provision as to delays caused by war excused the seller's failure to deliver and, therefore, prevented or excused a breach of contract.

Furthermore, assuming that the corporation transferred a chose in action for breach of contract, the partnership's remedy would be an action for damages and not a proceeding to enforce an agreement to arbitrate. The partners are entirely

different parties from the corporation with which the contract was made, and the assignment of the chose in action did not transfer to them the corporation's right to compel arbitration.

The second ground for the decision is that the seller waived its rights under the nonassignability clause by entering into negotiations for a compromise and making a compromise of the claim for damages for nonperformance. Evidence is summarized in the opinion which indicates that the seller waived its rights in this regard. But a careful reading of the correspondence clearly shows that the canner did not intend to waive its rights under the nonassignability clause.

In its first letter replying to the demands of counsel for the partnership, the seller's attorney stated, under date of June 10, 1943, that ''We have not yet had an opportunity to assemble all the facts surrounding this matter,'' and he expressed the desire of his client to keep the goodwill of its customers. About three weeks later he wrote that ''. . . after a discussion of the facts, we are forced to the conclusion that your client has no cause of action in this matter.'' Shortly thereafter, the seller offered to enter into a ''new contract'' and the partners agreed to this disposition of the controversy.

But the terms of the ''new contract'' were never agreed upon by the parties. The negotiations carried on into September when the partners stated that they would accept ''. . . 1½ cars of tomato paste in No. 10 containers at the prevailing market price provided delivery is made prior to the end of September, 1943.'' In their letter they added: ''You, of course, will understand that our offer to settle upon this basis is without prejudice to our rights, in the event that your client does not make the delivery prior to the end of September.'' Confirmation of this offer was requested, but the seller, by a telegram dated October 27, 1943, rejected the proposal. The partnership then made a demand for arbitration. The seller replied that the contract was not assignable but it expressed a willingness to arbitrate with the corporation.

This correspondence shows, without conflict, that the seller did not waive its rights under the nonassignability clause. It repeatedly and consistently took the position that the partnership had no rights by virtue of the assignment. The offer to deal with the partnership related only, in the express words of the seller, to the entering into of a ''new contract'' between the parties. This ''new contract'' was never consummated. And if the correspondence reasonably is susceptible of the

contrary interpretation that there was waiver, it constitutes evidence from which conflicting inferences may be drawn. This conflict was resolved by the trial judge in findings which declare: ''That it is not true that since the dissolution of . . . [the corporation], [the seller] . . . has repeatedly or at all recognized or dealt with . . . [the partnership] . . . as the owner of said contract,'' and, ''That . . . [the seller] . . . never at any time consented to any assignment of said contract.''

The decision reversing the judgment is also placed upon the ground that the rights of the seller are not affected by the nonassignability clause of the contract when a corporation is the buyer and upon its dissolution the contract rights are assigned to the shareholders who continue the business of the corporation as copartners. I cannot concur in that conclusion. Furthermore, the partnership would not have had the right to arbitrate the issue as to assignability, even if there had been no waiver.

A well established rule is that a contract is not assignable where the parties expressly stipulate to the contrary. (*La Rue* v. *Groezinger,* 84 Cal. 281, 283 [24 P. 42, 18 Am.St.Rep. 179]; *Stein* v. *Cobb,* 38 Cal.App.2d 8, 11 [100 P.2d 358]; *Murphy* v. *Luthy Battery Co.,* 74 Cal.App. 68, 74 [239 P. 341]; 2 Williston, Contracts, rev. ed., § 422; Rest., Contracts, § 151; 4 Am.Jur. 234, 235; 3 Cal.Jur. 239.) According to the Restatement, ''A right may be the subject of effective assignment unless, (a) the substitution of a right of the assignee for the right of the assignor would vary materially the duty of the obligor, or increase materially the burden or risk imposed upon him by his contract, or impair materially his chance of obtaining return performance, or (b) the assignment is forbidden by statute or by policy of the common law, or (c) the assignment is prohibited by the contract creating the right.'' (Rest., Contracts, § 151; see 4 Am.Jur. 235.) The effect of a nonassignability clause is stated by Williston as follows: ''In an agreement to convey real estate it is not unusual to provide that the vendee shall not assign his right to a conveyance, and the provision is usually upheld; so, likewise, of a provision in a contract to sell goods that the buyer shall not assign his right.'' (2 Williston, Contracts, rev. ed , § 422, p. 1214.) And closely in point with the case now under review is *Niagara Fire Extinguisher Co.* v. *Hibbard,* 179 F. 844 [103 C.C.A. 330], holding that the plaintiff, which took

by bill of sale from another corporation, afterwards dissolved, all of its property, but without assuming any of the liabilities of the grantor, was not the legal successor of such grantor. The grantee corporation, said the court, did not succeed to the former's rights under a contract granting it a license, which, by the terms of the contract, was not assignable without the consent of the other contracting party. (See, also, *Dunkley Co.* v. *California Packing Corp.*, 277 F. 989; *Burck* v. *Taylor*, 152 U.S. 634 [14 S.Ct. 696, 38 L.Ed. 578].)

The majority opinion also, in effect, disregards the corporate entity. This cannot be done unless the "observance of the fiction of separate existence would, under the circumstances, sanction a fraud or promote injustice. Bad faith in one form or another must be shown before the Court may disregard the fiction of separate corporate existence." (*Hollywood Cleaning & P. Co.* v. *Hollywood L. Service*, 217 Cal. 124 [17 P.2d 709] ; see *Dos Pueblos Ranch & Imp. Co.* v. *Ellis*, 8 Cal.2d 617 [67 P.2d 340] ; *Erkenbrecher* v. *Grant*, 187 Cal. 7 [200 P. 641].) Nor may the stockholders disregard the fiction; only third persons dealing with the corporation to their detriment have the right to invoke that doctrine. (*Watson* v. *Commonwealth Ins. Co.*, 8 Cal.2d 61 [63 P.2d 295].)

In *New York Bank Note Co.* v. *Hamilton Bank Note Engraving & Printing Co.*, 180 N.Y. 280 [73 N.E. 48], a contract owned by a corporation before dissolution was assigned to a reorganized corporation having the same stockholders. The New York Supreme Court held that, in effect, there was no assignment; the reorganization of a corporation did not prevent the new company from succeeding to all the rights and liabilities arising under the contracts of the old organization. However, the Court of Appeal declared: "From this [conclusion] we wholly dissent. The plaintiff was not only technically but substantially a different entity from its predecessor. . . . The defendant Kidder Company could not be obliged to intrust its money collected on the sale of the presses to the responsibility of an entirely different corporation from that which it had contracted, and we hold that the contract could not be assigned to the plaintiff without the assent of the other party to it."

Accordingly, when, as in the present case, the contract of the parties includes a provision prohibiting assignment, their agreement in that regard should be upheld and enforced. As the court said in *City of Omaha* v. *Standard Oil Co.*, 55 Neb.

337 [75 N.W. 859], ". . . it is needless for us to speculate on the motives for the . . . action. It is enough for us to know—whatever its reasons may have been—that it has, in plain language, stipulated against an assignment of the contract. That stipulation is valid, and must be enforced. To hold that it covers some, but not all, of the rights and obligations arising out of the contract, would be, it seems to us, an inexcusable perversion of its terms.''

The rule that a provision prohibiting assignment does not preclude a transfer by operation of law cannot aid Trubowitch and his associates. The assignment relied upon by them was made in connection with the voluntary dissolution of the corporation in which they were the sole stockholders. And not one of the cases cited in the majority opinion supports the statement that if an assignment of contract rights results merely from a change in the legal form in which the business is conducted, the court may determine whether such a transfer affects the interests of the parties to be protected by the prohibition against such action. Each of these decisions concerns a contract having no nonassignability clause. And most of them, by implication at least, recognize the rule to be that, if a contract contains a stipulation against assignment, it ordinarily prevents the assignment of contract rights from one legal form of business to another.

Nor are the cases relating to an assignment of a lease controlling. They concern the rule that a condition involving a forfeiture of rights under a lease must be strictly interpreted against the party for whose benefit it is created. No forfeiture of rights is involved in the present case. Furthermore, in *Randol* v. *Scott*, 110 Cal. 590 [42 P. 976], the only decision by this court relied upon to support the reversal of the judgment in favor of the sellers, the provision there construed, it was said, must be presumed to mean that the lease should not be assigned by the joint act of the lessees. An assignment by one joint lessee was held not to work a forfeiture of the lease. And in *Safeway Stores, Inc.* v. *Buhlinger,* 85 Cal.App. 717 [259 P. 1013], it was stated that the covenant against assignment is violated when made to a stranger to the original agreement, that is, not one of the joint lessees. In view of the legal fiction of corporate entity, the assignment by a corporation to a partnership is tantamount to the joint act of lessees, and, under the reasoning of the lease cases, the assignment should be declared invalid.

Moreover, whether the contract was assignable was an issue exclusively for the determination of the superior court; it could not have been submitted to arbitration even if the partnership had not waived its rights in this regard. As I read section 1282 of the Code of Civil Procedure, it requires a judicial decision as to all questions concerning the status of a contract whose provisions are in controversy. The statute provides: ". . . The court shall hear the parties, and upon being satisfied that the making of the agreement or such failure to comply therewith is not in issue, shall make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement. If the making of the agreement or the default be in issue an order shall be made directing a summary trial thereof. . . . If the finding be that no agreement in writing providing for arbitration was made, or that there is no default in the proceeding thereunder, the proceeding shall be dismissed. . . ." Certainly, the requirement that the court shall summarily try any issue tendered by the parties as to "the making of the agreement or the default," compels a judicial determination as to whether an asserted assignment is valid. For if the assignment be invalid, there is no agreement upon which arbitration may be enforced, and there has been no default as to such provision.

This principle was stated and applied in *Hanes* v. *Coffee*, 212 Cal. 777 [300 P. 963]. The defendant, answering the allegations of the complaint to quiet title, set up an interest in the property under an oil lease. The lease required "any question of fact affecting the rights of the parties" to be settled by arbitration. The trial court struck out a pleaded defense that the action was premature because of the failure to invoke the provision for arbitration. The dispute concerning the title was not subject to arbitration in the first instance, this court held upon appeal from a judgment in favor of the plaintiff, because of the claim "that by reason of failure of the lessee to commence operations within the specified period, the lease never became operative, or if it did, is now terminated."

There can be no logical distinction drawn between the issues pleaded by the canning company in bar of Trubowitch's demand for arbitration and the situation of the parties in the Hanes case. Paraphrasing the language of this court in deciding the earlier controversy, if the allegations in regard to the assignment of the contract are sustained, the contract,

including the arbitration provision, is wholly inoperative and Trubowitch can claim no rights thereunder. (212 Cal. at p. 780.) The district court of appeal has followed the Hanes case in three decisions. (*Johnson* v. *Atkins,* 53 Cal.App.2d 430 [127 P.2d 1027]; *Stetson* v. *Orland Oil Syndicate, Ltd.,* 42 Cal.App.2d 139 [108 P.2d 463]; *Friedlander* v. *Stanley Productions,* 24 Cal.App.2d 677 [76 P.2d 145].)

The field of arbitration is a limited one and presupposes a judicial determination of any disputed issue which concerns the question as to whether there is a valid contract between the parties at the time of the demand for arbitration. Professor Williston states the law in this regard as follows: "When the claim, however, is that the contract is invalid because of fraud, duress, failure of consideration, rescission, cancellation, accord and satisfaction, there is much doubt on the matter, but it is probable that the court will first pass on the issue of fraud, etc., even if the arbitration clause seems broad enough to allow the arbitrators themselves to pass on those issues of fraud." In a footnote to this statement, he adds: "It seems clear that the court should first pass on these issues before ordering arbitration. . . ." (Williston on Contracts, § 1920, pp. 5370, 5371.)

This rule rests upon fundamental principles. In the event that a defendant in resisting a proceeding to compel arbitration pleads a defense concerning the validity of the contract which would bar an award against him upon the merits of the controversy, a finding in his favor by arbitrators would destroy the only basis of their jurisdiction, which is a valid contract to arbitrate. Such an issue, therefore, requires judicial determination. "If the defendant is found correct in his contention, judgment for the defendant could be granted. If the finding is made for the plaintiff, unless the defendant has other issues to raise at the arbitration, judgment for the plaintiff should be given, or if the defendant is to raise issues other than his already presented defense at the arbitration, the arbitrators should be informed of the decision of the court on the motion to compel and be bound thereby." (Phillips, *The Paradox in Arbitration Law: Compulsion as Applied to a Voluntary Proceeding,* 46 Harv.L.Rev. 1258, 1270-1272.)

New York was the first state to enact a statute broadly allowing the arbitration of disputes otherwise requiring judicial determination. Its courts have refused to allow issues of fraud in the making of a contract to be decided by arbitra-

tion. In *Application of Manufacturers Chemical Co.*, 259 App.Div. 321 [19 N.Y.S.2d 171], appeal dismissed 283 N.Y. 679 [28 N.E.2d 404] ; 287 N.Y. 840 [41 N.E.2d 167], the defendant objected to arbitration upon the ground that the contract was obtained by fraud. The court held that the corporation had the right to a jury trial upon the question as to whether the contract was enforceable. It said: "While otherwise irrevocable, agreements to arbitrate are, nevertheless, subject to 'such grounds as exist at law or in equity for the revocation of any contract'; and where a contract may be avoided at law or in equity, a provision for arbitration may be resisted (citing cases). . . . Our conclusion is that the petitioner is entitled to a trial with respect to the allegations in the petition concerning the making of the misrepresentations, their falsity and petitioner's reliance thereon. If proved, the petitioner is in a position where it rightfully has rescinded the contracts. If this be so, no arbitration may be had since the provision therefor in each contract would fall with the contract itself." (Followed in *Application of Jacoby,* 33 N.Y.S.2d 621; see *Cheney Bros. v. Joroco Dresses,* 218 App. Div. 652 [219 N.Y.S. 96] (reversed on other grounds in 245 N.Y. 375 [157 N.E. 272]) ; *In re Exeter Mfg. Co.,* 254 App. Div. 496 [5 N.Y.S.2d 438].)

The position of the canning company in the present case is substantially the same as that taken by the defendant in *Japan Cotton Trading Co. v. Farber,* 233 App.Div. 354 [253 N.Y.S. 290]. The parties had made a contract which included provisions by which they agreed to submit to arbitration any differences between them. Farber pleaded, in defense of the right to arbitration, an asserted accord and satisfaction. The court held that this issue must first be determined in a trial by jury, saying: "If the compromise agreement or settlement shall be found to be as contended for by Farber, of course, no arbitration may be had, for the agreements calling for such were superseded by the terms of the settlement. If, on the other hand, the preliminary issues are determined in favor of Trading Company, arbitration well might be compelled. . . ." (See *In re Worcester Silk Mills Corp.,* 50 F.2d 966.)

Each of these cases stands for the proposition that in every proceeding for the enforcement of a contract by which the parties have agreed to the determination by arbitration of

disputes arising under it, a plea of the invalidity of the contract at the time of the demand entitles the defendant to a judicial trial of that issue. To imply that this issue may be determined by arbitration is contrary to the express terms of the statute.

For these reasons, I would affirm the judgment.

Schauer, J., and Spence, J., concurred.

Respondent's petition for a rehearing was denied July 17, 1947. Edmonds, J., Schauer, J., and Spence, J., voted for a rehearing.